FILED
United States Court of Appeals
Tenth Circuit

**August 2, 2010**

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

HUGH B. MCKEEN,

     Plaintiff-Appellant,

v.

UNITED STATES FOREST
SERVICE, an Agency of the United
States Department of Agriculture;
TOM VILSACK, in his official
capacity as Secretary of the United
States Department of Agriculture;
TOM TIDWELL, in his official
capacity as Chief of the Forest
Service; CORBIN L. NEWMAN, in
his official capacity as Regional
Forester for the Southwest Region,
State of New Mexico; RICHARD E.
MARKLEY, in his official capacity as
Forest Supervisor of the Gila National
Forest, State of New Mexico; PAT
MORRISON, in her official capacity
as the Glenwood District Ranger in the
Gila National Forest,

     Defendants-Appellees.[*]

No. 08-2290

---

     [*] Pursuant to Fed. R. App. P. 43(c)(2), Tom Vilsack, Tom Tidwell, Corbin
L. Newman, and Richard E. Markley, in their official capacities, replace the
previous office holders named in the Complaint.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:07-CV-00503-MCA-KBM)**

Submitted on the briefs:

Karen Budd-Falen, and Kathryn Brack Morrow, Budd-Falen Law Offices, LLC, Cheyenne, Wyoming, for Plaintiff-Appellant.

Ignacia S. Moreno, Assistant Attorney General, Aaron P. Avila, Andrew A. Smith, and Susan L. Pacholski, Attorneys, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Defendants-Appellees.

Before **BRISCOE,** Chief Judge, **HAWKINS**[**], and **O'BRIEN**, Circuit Judges.

**BRISCOE**, Chief Judge.

For more than forty years, the United States Forest Service (hereinafter "Forest Service") has granted Plaintiff Hugh B. McKeen and his family a series of term livestock grazing permits to graze cattle and/or horses on the Cedar Breaks Allotment in the Glenwood Ranger District of the Gila National Forest in Catron County, New Mexico. Recently, McKeen sought to have several Forest Service actions which affected these permits set aside pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. The district court denied each of

---

[**] The Honorable Michael D. Hawkins, Senior Circuit Judge for the Ninth Circuit Court of Appeals, sitting by designation.

2

McKeen's requests for relief and McKeen filed this timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291, and AFFIRM in part and VACATE in part. With respect to those claims which we vacate, we REMAND to the district court with instructions to DISMISS as moot.[1]

# I

*Statutory/Regulatory Background*

Pursuant to Section 19 of the Granger-Thye Act of 1950, Pub. L. No. 97-478, § 19, 64 Stat. 82, 88 (1950) (codified at 16 U.S.C. § 580*l*), Congress has authorized the Secretary of Agriculture to allow livestock to be grazed on specified allotments within the National Forest System. The Secretary of Agriculture, through the Forest Service, authorizes such grazing by issuing (1) Forest Plans, see generally 16 U.S.C. § 1604; 36 C.F.R. § 219.1-.16; (2) Allotment Management Plans ("AMPs"), see 43 U.S.C. § 1752(d); 36 C.F.R. §§ 222.1(b)(2), 222.2; (3) term grazing permits, see 43 U.S.C. § 1752(a); 36 C.F.R. §§ 222.1(b)(5), 222.3; and (4) Annual Operating Instructions[2] ("AOIs").

As we have previously explained,

---

[1] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is, therefore, submitted without oral argument.

[2] Prior to 2004, the Forest Service referred to AOIs as "Annual Operating Plans," or "AOPs." Though the terms AOI, AOP, and AOP/I are often used interchangeably, for convenience and clarity, AOI is used throughout this opinion.

3

[A] Forest Plan [is] a broad, programmatic document, accompanied by an environmental impact statement and public review process conducted in accordance with the National Environmental Policy Act. 42 U.S.C. § 4331 et seq. [("NEPA")]; see also 16 U.S.C. § 1604(d); 36 C.F.R. § 219.10(b). The Forest Plan must incorporate multiple forest uses, and thus coordinate the management of "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). The Forest Plan must also "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." Id. at § 1604(g)(3)(B).

Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1167-68 (10th Cir. 1999) (footnote omitted).

An AMP, meanwhile, "[p]rescribes the manner in and extent to which livestock operations will be conducted" within a designated area, or allotment, within a certain national forest. See 36 C.F.R. § 222.1(b)(2)(i). While an AMP is not a necessary prerequisite to the issuance of a grazing permit, see 43 U.S.C. § 1752(d), (e), when one is created it "[d]escribes the type, location, ownership, and general specifications for the range improvements in place or to be installed and maintained on the land to meet the livestock grazing and other objectives of land management," 36 C.F.R. § 222.1(b)(2)(ii). AMPs must be consistent with the Forest Plan for the forest in which the allotment sits. Id. § 222.2(c); see also 16 U.S.C. § 1604(i). Indeed, "the AMP relates the directives of the applicable [F]orest [P]lan to the individual grazing allotment . . . ." Or. Natural Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 980 (9th Cir. 2006).

A grazing permit grants its recipient a license to graze livestock on certain

4

designated allotments "in accordance with provisions of the . . . [relevant] Forest Service policies," including the relevant Forest Plan and any relevant AMPs. See 36 C.F.R. § 222.3(c)(1); see also 43 U.S.C. § 1752(a), (d), (e). Notably, grazing permits "convey no right, title, or interest held by the United States in any lands or resources." 36 C.F.R. § 222.3(b); accord 43 U.S.C. § 1752(h). Rather, they merely grant a license "and establish[]: (1) the number, (2) kind, (3) and class of livestock, (4) the allotment to be grazed, and (5) the period of use." Or. Natural Desert Ass'n, 465 F.3d at 980 (citing 43 U.S.C. § 1752; 36 C.F.R. §§ 222.1-222.4). Typically, a grazing permit is issued for a period of ten years, see 36 C.F.R. § 222.3(c)(1); see also 43 U.S.C. § 1752(a), and, "[a] term permit holder has first priority for receipt of a new permit at the end of the term period provided he has fully complied with the terms and conditions of the expiring permit." 36 C.F.R. § 222.3(c)(1)(ii); see also 43 U.S.C. § 1752(c).

Finally, AOIs are signed agreements between the Forest Service and grazing permit recipients which set forth the parameters of the permit holder's license for the upcoming year. See Forest Service Manual § 2212.3. As the Ninth Circuit explained:

> Because an AOI is issued annually, it is responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the AMP or grazing permit, such as drought conditions, timing and duration of rainfall over the grazing season, success or failure of habitat restoration projects, water quality, or degree of risk to threatened or endangered species affected by grazing.

5

Or. Natural Desert Ass'n, 465 F.3d at 980-81.

*Factual/Procedural Background*

The Forest Service first issued McKeen's family a permit to graze livestock on the Cedar Breaks Allotment in 1968 and subsequent permits have been issued to McKeen and his family in 1976, 1985, 1996, and most recently, in 2004.  The 2004 permit is set to expire on December 31, 2013.

Despite the Forest Service's long history of permitting McKeen and his family to graze livestock on the Cedar Breaks Allotment, over time McKeen's relationship with the agency began to deteriorate.  Prior to the instant action, McKeen joined a group of plaintiffs who, in 1998, filed a lawsuit challenging several Forest Service actions which affected grazing within the Gila National Forest.  See N.M. Pub. Lands Council v. United States, No. 1:98-cv-00984 (D.N.M. filed Aug. 14, 1998).  Among the Forest Service actions challenged in the 1998 lawsuit was the agency's decision to exclude livestock from the San Francisco River, a waterway which runs through portions of the Cedar Breaks Allotment.

The 1998 lawsuit eventually settled in the fall of 2000.  The Forest Service agreed, *inter alia*, to "complete a site-specific analysis pursuant to [NEPA] for . . . the Cedar Breaks [Allotment],"[3] and agreed that "the NEPA analys[is] w[ould]

---

[3] Pursuant to NEPA:

(continued...)

6

result in an administratively appealable decision by July 15, 2001." Aplee. Supp. at 9. McKeen and his co-plaintiffs agreed to abide by the terms of their 2000 and 2001 AOIs "until any new or revised [AMPs] and permits [were] in place following the NEPA process and any administrative appeals." Id. However, despite this settlement, disputes continued between McKeen and the Forest Service.

In the immediate aftermath of the settlement, issues between McKeen and the Forest Service centered primarily around McKeen's continued grazing and/or other incidental use of certain portions of the Cedar Breaks Allotment near the San Francisco River. During this period, the Glenwood District Ranger repeatedly warned McKeen that use of this area was forbidden by the terms of his term grazing permit and/or AOIs. Nevertheless, Forest Service personnel continually observed McKeen's livestock grazing in this area. Eventually, this

_____

[3](...continued)
[M]ajor Federal actions significantly affecting the quality of the human environment must be preceded by an environmental impact statement or EIS. Before creating an EIS, however, a government agency may prepare a document called an environmental assessment (EA). If after preparing the EA, the agency concludes that a proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact (FONSI) and need not prepare a full EIS.

S. Utah Wilderness Alliance v. Norton, 301 F.3d 1217, 1237 (10th Cir. 2002) rev'd on other grounds, 542 U.S. 55 (2004) (citations and internal quotation marks omitted).

7

dispute led the Glenwood District Ranger to send McKeen a letter dated May 15, 2001, explaining that due to his non-compliance, the District Ranger was suspending 20% of the number of livestock McKeen was previously permitted to graze for a period of one year, effective June 1, 2001. McKeen challenged this decision by filing an administrative appeal of the District Ranger's action in June of 2001, but the parties eventually reached a mediated settlement in July of 2001. Pursuant to this settlement agreement, the District Ranger reduced McKeen's permit suspension to 5% for one year with a warning that continued violations of the terms of McKeen's permit would result in a permanent cancellation of 5% of the permitted number of livestock and an additional 20% suspension for two years.

McKeen agreed, conversely, to "pursue a conservation agreement . . . with the U.S. Fish and Wildlife Service that may allow him the opportunity for incidental or miscellaneous use of [certain property within the Cedar Breaks Allotment]." Aplt. App. at 290. Further, it was agreed that if McKeen was granted incidental use of this property, the Forest Service would provide fencing materials and two cattle guards for McKeen to install to aid in his use of the property. If, however, McKeen was not granted incidental use of the property, the Forest Service agreed to purchase fencing material and to build the fence necessary to keep McKeen's cattle off of the property, but it was agreed that McKeen would be responsible for the fence's maintenance. Id. at 290-91.

8

Despite this mediated agreement, issues regarding McKeen's use of certain property within the Cedar Breaks Allotment continued into the spring of 2002. Ultimately, these issues led the Glenwood District Ranger to issue McKeen a Notice of Non-Compliance on May 24, 2002. Therein, McKeen was informed that he had "until the end of the day on Saturday, May 25, 2002 to [cure his non-compliance]," and "[a]dditionally, [that he] must prevent any additional [non-compliance]." Id. at 310. Finally, McKeen was told that "[t]he District w[ould] do a follow up inspection in the next several days to validate [his] corrective action," and that "[f]ailure to correct . . . within the prescribed time period, as well as preventing further [non-compliance], may result in adverse action against [his] term-grazing permit." Id.

Despite the warnings contained in the Notice of Non-Compliance, Forest Service personnel once again observed that McKeen was out of compliance on May 28, 2002. Consequently, the Glenwood District Ranger sent McKeen a letter on June 5, 2002, explaining that he was "canceling 5% of [McKeen's] Term Permitted Numbers and suspending an additional 20% of [McKeen's] Term Permitted Numbers for a period of two years" as per the warnings set forth in the July 2001 settlement agreement and the May 24, 2002 Notice of Non-Compliance. Id. at 315.

Despite this reduction in the number of livestock McKeen was permitted to graze, Forest Service personnel continued to note McKeen's failure to comply

9

with the terms of his grazing permit and/or AOIs throughout the course of the summer and fall of 2002.[4] These observations caused the Glenwood District Ranger to issue McKeen another Notice of Non-Compliance on September 12, 2002. This notice informed McKeen that "[i]n order to achieve compliance . . . [he] must remove all [his] cattle from the South Cedar Breaks Pasture by September 13, 2002," and additionally, "[i]n order to achieve compliance throughout the remainder of the 2002 grazing season as well as in subsequent years in reference to meeting utilization standards [he] must move [his] livestock out of a pasture before maximum use levels specified in [his] annual operating instructions are exceeded." Id. at 414. Finally, the notice explained that "[t]he Cedar Breaks Allotment w[ould] be inspected on September 14, 2002," id. at 415, and warned that failure to achieve compliance by that time would "result in the initiation of permit suspension or cancellation proceedings," and that "any subsequent violations of excessive utilization may result in permit suspension or cancellation," id. at 414.

---

[4] These observations of non-compliance were noted in McKeen's record, though McKeen alleges that in many instances he was not personally notified. Indeed, according to McKeen, the one instance of non-compliance which was brought to his attention—an observation of seven unauthorized head of cattle in the South Cedar Breaks Pasture on August 22, 2002—was timely cured by his taking of the Glenwood District Ranger's requested action. Moreover, McKeen also notes that Forest Service personnel observed him to be in compliance during portions of this time period, including during a compliance check performed on September 3 and 4, 2002.

On September 13, 2002, the District Ranger wrote McKeen another letter in which he included a list of McKeen's AOI violations between March and September of 2002 and mentioned that he was "becoming very concerned at what appear[ed] to be a complete lack of compliance with [McKeen's] Annual Operating Plan/Instructions." Id. at 416. Subsequently, however, Forest Service personnel at least twice more observed McKeen in violation of his AOIs; once on September 16, 2002, and once on October 3, 2002.

Eventually, the District Ranger sent McKeen a letter dated October 8, 2002, reminding McKeen of the language of the September 12, 2002 Notice of Non-Compliance and informing McKeen that throughout the course of 2002, he had "exceeded utilization standards" in three pastures within the allotment. See id. at 442. The District Ranger concluded by stating that:

> Based on . . . continued incidents of noncompliance, the documentation in [the] September 13, 2002 letter, and my concern about present and continuing resource damage, I am, with this letter, withdrawing my June 5, 2002 decision, which canceled 5% of your Term Permitted Numbers and suspended an additional 20% of your Term Permitted Numbers for a period of two years, and issuing a new decision to cancel 25% of your Term Permitted Numbers. Your Term Grazing Permit is hereby modified from 145 Cattle (Cow/Calf) to 108 Cattle (Cow/Calf), effective immediately.

Id.

Meanwhile, the Forest Service eventually completed the site-specific analysis of the Cedar Breaks Allotment it had promised to undertake as part of the settlement agreement reached in the 1998 lawsuit in which McKeen was a

11

plaintiff. The Forest Service began by issuing an environmental assessment (EA) pursuant to NEPA, which "disclos[ed] the effects of implementing 6 grazing management alternatives." See id. at 360, 361-93. This EA was released for public comment on July 19, 2002. Subsequently, the Glenwood District Ranger issued a document captioned as a Decision Notice Finding of No Significant Impact Grazing Authorization and Allotment Management Plan Cedar Breaks Allotment USDA Forest Service Gila National Forest Glenwood Ranger District Catron County, New Mexico (hereinafter "Decision Notice") on September 27, 2002. Id. at 424. In the Decision Notice, the Glenwood District Ranger indicated that "[i]t [was his] decision to issue a ten-year grazing permit that implements Alternative 5." Id.

Pursuant to Alternative 5, the Glenwood District Ranger was to issue McKeen a ten-year term grazing permit for 0 to 145 head of cattle (cow/calf) and 5 head of horses (saddle) with grazing to be permitted for between 0 and 12 months in any given year and with "[t]he duration of grazing use [to] be determined by maintaining minimum stubble heights." Id. at 425. The Decision Notice also listed a series of "priority improvements [that] will be in place within the first year to support the numbers projected," explaining that "[i]f the improvements are not in place, there will be an adjustment based on the improvement that hasn't been completed." Id. at 426. Finally, because the Glenwood District Ranger's Decision Notice was issued before the October 8,

12

2002 cancellation of McKeen's permitted numbers, the Decision Notice contained language explaining that the term grazing permit which McKeen held at the time was "under administrative action for suspension/cancellation," and accordingly, that "[t]he final disposition of any administrative action [would] be assessed against the permit issued from the [Decision Notice]." Id. at 424.

Eventually, McKeen administratively appealed both the Glenwood District Ranger's September 27, 2002 Decision Notice and October 8, 2002 cancellation of 25% of his permitted numbers. However, both the Gila Forest Supervisor, and eventually the Regional Forester in Albuquerque, New Mexico, affirmed each of the District Ranger's actions. After these appeals had run their administrative course, in early 2004, the Glenwood District Ranger proposed a new term grazing permit to McKeen. The proposed permit would have, by its own terms, superseded McKeen's then-existing permit and incorporated sections reflecting both the October 8, 2002 cancellation of McKeen's previously permitted numbers and several aspects of the September 27, 2002 Decision Notice.[5] More specifically, the proposed permit included: (1) a section explaining that "[a]s per [the] NEPA decision signed on September 27, 2002 and [the] Administrative

_____

[5] The Glenwood District Ranger had contemplated proposing this new permit by at least as early as December of 2003. See Aplt. Supp. App. at 1 ("This letter will serve as an [AOI] Amendment for the Cedar Breaks Allotment for the period of December 1st through the end of February 2004. Prior to the end of February a long term plan will need to be developed for the coming grazing season.").

13

Action dated October 8, 2002, permitted numbers may vary from 0-108 cattle and season of use may vary from 0-12 months," id. at 563; and (2) a section listing six improvements which "w[ould] be in place within the first year of issuance of th[e] permit," id. at 571. McKeen agreed to the terms of the new proposed grazing permit, signing it on February 27, 2004. McKeen noted, however, that he did so "under duress to reduce the stress to [him] and [his] family." Id. at 574.

More than two years later, on March 30, 2006, two employees of the Glenwood District Ranger's office met with McKeen to discuss issues and conditions related to the Cedar Breaks Allotment. On May 22, 2006, the Glenwood District Ranger wrote McKeen a letter memorializing the substance of this meeting and of a previous letter McKeen had sent to the District Ranger. Therein, the Glenwood District Ranger began by explaining that McKeen had raised three issues with the District Ranger: (1) McKeen indicated that he believed that the presence of the "as per [the] NEPA decision . . ." language in the grazing permit which he agreed to in February of 2004 was "unfair," id. at 586; (2) McKeen requested that his permit numbers be reinstated to their pre-October 2002 numbers; and (3) McKeen indicated his belief that the "[r]ange developments specified in the [September 2002 NEPA] decision are not all necessary and various details of the monitoring and rotation plan are not fair to [me]," id. at 587.

Responding to concerns that McKeen had expressed, the District Ranger's

14

letter explained that he: (1) planned to amend McKeen's permit to delete the "as per [the] NEPA decision . . ." language, id. at 586; (2) would not consider reinstating McKeen's permit numbers because McKeen was "not fully compliant with the terms and conditions of [his] permit at th[at] time," id. at 587; and (3) planned to make several modifications to the monitoring and improvements sections of McKeen's permit, which would alleviate certain burdens which had previously been placed on McKeen and/or would extend the deadline for certain improvements to be made.

In response, McKeen sent the Glenwood District Ranger a letter dated October 10, 2006. Therein, McKeen noted that he "appreciate[d] the amendments" to his permit and that in his opinion "[t]he changes . . . are common sense." Id. at 590. McKeen, however, challenged the Glenwood District Ranger's refusal to reinstate his pre-October 2002 numbers, noting that the Glenwood District Ranger's "letter did not specifically state where [McKeen was] in noncompliance." Id. The Glenwood District Ranger responded by sending McKeen a letter dated October 24, 2006. Therein, the Glenwood District Ranger clarified his position regarding reinstatement and referred McKeen to a portion of the May 22, 2006 letter which the District Ranger believed demonstrated where McKeen was in noncompliance.

In response, McKeen sent a letter to the Gila Forest Supervisor, Marcia Andre, "appealing the decisions made in a letter dated 10/24/06 and written by the

15

Glenwood [District] Ranger . . . ." Id. at 593. Andre replied to McKeen in a letter informing him that the Glenwood District Ranger's "letter of October 24th does not contain an appealable decision." Id. at 608. Indeed, as Andre explained:

> The decision to reduce the number of livestock you are permitted was made previously and your permit amended. You appealed that decision and the appeal process has been completed. . . . Therefore, [the District Ranger] is reaffirming a prior decision. Under 36 C.F.R. [§] 251.83(o), reaffirmation of prior decisions is not appealable.

Id.

Finally, on May 22, 2007, McKeen filed a Complaint for Injunctive and Declaratory Relief in the United States District Court for the District of New Mexico naming the Forest Service, the Secretary of Agriculture, and various Forest Service employees as defendants (collectively "Forest Service"). In the first prayer for relief stated in his complaint, McKeen sought "[a] declaration that the [Forest Service's] October 8, 2002 and May 22, 2006 decisions to permanently cancel 25 percent of [his] term grazing permit were not supported by the evidence." See id. at 32. In the remaining prayers for relief, McKeen sought declarations that the Forest Service acted arbitrarily and capriciously and/or abused its discretion, (1) "by issuing a [Decision Notice] that was not based on data or range science"; (2) "in how it implemented its [Decision Notice] and NEPA decision"; and (3) "by using the now scientifically condemned stubble height methodology for managing [his] allotment." Id. at 32-33. Finally, McKeen sought an award of costs and attorney's fees pursuant to 28 U.S.C. §

16

2412.

In its Memorandum Opinion and Order, the district court analyzed McKeen's claims under the APA, and ultimately denied each of McKeen's prayers for relief.[6] McKeen then filed this timely appeal in which he presents two issues for our review: First, "[w]hether the [Forest Service] acted in an arbitrary and capricious manner, abusing its discretion, when it permanently cancelled 25 percent of [his] grazing permit?" Aplt. Op. Br. at 1. And second, "[w]hether the [Forest Service] acted in an arbitrary and capricious manner, abusing its discretion, when it implemented its September 27, 2002 [Decision Notice], [and] when it modified that decision regarding range improvements?" Id.

## II

### *Standard of Review*

"Because none of the statutory or regulatory provisions in question provide for a private cause of action, the judicial review provisions of the APA govern this suit." Utah Shared Access Alliance v. Carpenter, 463 F.3d 1125, 1134 (10th Cir. 2006). We review the district court's decision in an APA case de novo. See Ctr. For Native Ecosystems v. Cables, 509 F.3d 1310, 1320 (10th Cir. 2007).

Pursuant to the APA, we have jurisdiction to review only "final agency

---

[6] The district court's opinion and order also granted the Forest Service's motion to dismiss McKeen's claim that the Forest Service's October 8, 2002 permit modification was too severe. See Aplt. App. at 222.

17

actions." See 5 U.S.C. § 704. An agency action is considered "final" only if it marks "the consummation of the agency decision-making process" and legal consequences flow from it. See Tsegay v. Ashcroft, 386 F.3d 1347, 1354 (10th Cir. 2004) (internal quotation marks omitted).

As is relevant to this case, we will set aside a "final agency action" pursuant to 5 U.S.C. § 706(2)(A) only if we conclude that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." We consider an agency's action to be arbitrary and capricious:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). In reviewing agency actions under the "arbitrary or capricious" standard, our duty "is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." Citizens' Comm. to Save Our Canyons v. Krueger, 513 F.3d 1169, 1176 (10th Cir. 2008) (quoting Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir. 1994)). "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." Id. (quoting Colo. Health Care Ass'n v. Colo. Dep't of Soc. Serv., 842 F.2d 1158, 1164 (10th Cir. 1988)).

18

Finally, also relevant to this case is 5 U.S.C. § 558(c) which provides, in relevant part:

> Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given–
>
> > (1) notice by the agency in writing of the facts or conduct which may warrant the action; and
> >
> > (2) opportunity to demonstrate or achieve compliance with all lawful requirements.

*Did the Forest Service act in an arbitrary and capricious manner and/or abuse its discretion when it permanently reduced McKeen's previously permitted numbers?*

Pursuant to 43 U.S.C. § 1752(a), the Secretary of Agriculture has the authority "to cancel or suspend a grazing permit or lease [for National Forest System lands] for any violation of a grazing regulation or of any term or condition of such grazing permit or lease." Accord 36 C.F.R. § 222.4(a)(4). Section 558(c) of the APA generally requires, however, that before such a cancellation or suspension may take place, the permittee be given notice of his or her noncompliance and an opportunity to cure.[7] See Anchustegui v. Dep't of Agric., 257 F.3d 1124, 1129 (9th Cir. 2001) ("[Section] 558 applies to a grazing

---

[7] A variety of Forest Service Handbook and Manual provisions, as well as Forest Service Regulations also require notice and an opportunity to cure. As the district court noted, however, "[t]o the extent such regulations or policy statements are enforceable in [the judicial] context, . . . the [Forest Service's] compliance with them parallels the analysis of [the Forest Service's] compliance with 5 U.S.C. § 558(c)." Aplt. App. at 204.

19

permit."); accord Buckingham v. Sec'y of U.S. Dep't of Agric., 603 F.3d.1073, 1084-85 (9th Cir. 2010); cf. Smithfork Grazing Ass'n v. Salazar, 564 F.3d 1210, 1215 (10th Cir. 2009) ("assuming arguendo that grazing permits are licenses and permittees are licensees under § 558(c)"). Section 558(c) does not, however, "require that a [permittee] be apprised of precisely what action the agency will take because of his conduct." Lawrence v. Commodity Futures Trading Comm'n, 759 F.2d 767, 773 n.13 (9th Cir. 1985). Rather, it "only requires notice by the agency in writing of the facts or conduct which may warrant the action." Id. (emphasis and internal quotation marks omitted).

In his complaint, McKeen requested "[a] declaration that the [Forest Service's] October 8, 2002 and May 22, 2006 decisions to permanently cancel 25 percent of [his] term grazing permit were not supported by the evidence." Aplt. App. at 32. In his subsequent briefing to the district court, McKeen alleged that the Forest Service "acted in an arbitrary and capricious manner, abusing its discretion, when it did not provide [him] with due process prior to permanently cancelling 25 percent of his grazing permit." Id. at 83. In addressing McKeen's arguments, the district court limited its inquiry to whether the Forest Service complied with § 558(c). Ultimately, the district court concluded that the Forest Service did comply with § 558(c) before cancelling 25 percent of McKeen's previously permitted numbers and that "[t]he [Glenwood] District Ranger's decision not to increase the number of livestock permitted on the allotment in

20

May 2006[8] [was] not properly before the Court because . . . . the APA authorizes courts to compel agency action [pursuant to] 5 U.S.C. § 706(1) [] only when an agency has failed to take a discrete agency action that it is required to take." Id. at 218-19 (quotation, citation and emphasis omitted).

On appeal, McKeen re-urges his due process argument, requesting that the cancellation of 25 percent of his grazing permit "be overturned" in light of the fact that "[t]he [Forest Service] acted in an arbitrary and capricious manner, abusing its discretion, when it did not provide [him] with due process prior to permanently canceling 25 percent of his grazing permit." Aplt. Op. Br. at 39. McKeen argues that "[w]hat the district court did not acknowledge . . . was that after each of the[] . . . allegations [of non-compliance leading up to the October 2002 permit cancellation], the [Forest Service] found that [he] was in compliance with his permit." Id. at 32. And thus, that "it is incongruent to find that any earlier alleged violations—which were obviously cured, as [he] was later found in compliance—provided notice sufficient to justify a 25% cut of [his] permit." Id. at 33.

As previously noted, however, the Glenwood District Ranger and McKeen

---

[8] The district court makes no mention of the fact that McKeen did not administratively appeal the District Ranger's failure to re-instate his permit numbers in May of 2006, but instead, administratively appealed the District Ranger's October 2006 refusal to reconsider his May 2006 decision. See Aplt. App. at 593 ("We are appealing the decisions made in a letter dated 10/24/06 and written by [the] Glenwood Ranger . . . .").

agreed to a new term grazing permit in February of 2004. Thus, the declaratory relief which McKeen seeks relates only to a now superseded permit. Concerned that these circumstances may preclude us from granting McKeen any effective relief, we ordered McKeen to show cause why we should not dismiss this issue as moot. See Wyoming v. U.S. Dep't of Interior, 587 F.3d 1245, 1250 (10th Cir. 2009) ("[W]e offer opinions only when doing so 'will have some effect in the real world.'" (quoting 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533.1, at 751 (3d ed. 2008)).

We consider mootness as a threshold issue because "Article III delimits the jurisdiction of federal courts, allowing us to consider only actual cases or controversies." Abdulhaseeb v. Calbone, 600 F.3d 1301, 1311 (10th Cir. 2010) (internal quotation marks omitted). "[T]he crucial question is whether granting a present determination of the issues offered will have some effect in the real world." Id. (internal quotation marks omitted). "When it becomes impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot." Id. (internal quotation marks omitted).

McKeen argues that his request for declaratory relief from the Glenwood District Ranger's cancellation of his previously permitted numbers is not moot because he contends that if we "determine that the October 8, 2002 action was unlawful," we have "accordingly determined that the basis for the 2004 permit is unlawful," and that as a result, the Forest Service "would be required to create a

22

new term permit which was not based on the unlawful cut in permitted numbers."

See Aplt. Resp. to Show Cause at 9-10. We disagree.

Simply put, because McKeen has not administratively appealed the terms of the permit to which he agreed in February of 2004, he is precluded from seeking judicial review of said terms or of the Forest Service's basis for imposing them. See Forest Guardians v. U.S. Forest Serv., 579 F.3d 1114, 1120 (10th Cir. 2009) rh'g en banc granted on other grounds, 597 F.3d 1128 (10th Cir. 2010) ("Claims not properly raised before an agency are waived . . . ." (quotation and citation omitted)); see also 7 U.S.C. § 6912(e) (requiring administrative exhaustion before a plaintiff may file suit against the Secretary of Agriculture, the Department of Agriculture, or any agency, office, officer, or employee of the Department); cf. 36 C.F.R. § 251.101 ("It is the position of the Department of Agriculture that any filing for Federal judicial review of and relief from [an administrative] decision . . . is premature and inappropriate, unless the appellant has first sought to resolve the dispute by invoking and exhausting the [administrative appeals] procedures . . . .").

McKeen contends that even if we are precluded from setting aside the permit to which he agreed in February of 2004, his claim is nonetheless justiciable because it fits into the mootness exception for issues which are "capable of repetition, yet evading review." This exception preserves the justiciability of an issue where: "(1) the duration of the challenged conduct is too

23

short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." See Disability Law Ctr. v. Millcreek Health Ctr., 428 F.3d 992, 996 (10th Cir. 2005) (alteration and internal quotation marks omitted). We disagree.

To begin, we disagree with McKeen's suggestion that if his case is moot, the path will be cleared for a District Ranger "to simply issue a new term grazing permit any time actions related to an older permit [are] challenged." See Aplt. Resp. to Show Cause at 12. A District Ranger cannot issue a superseding grazing permit at any time he or she sees fit. Rather, the Forest Service may only propose a superseding permit to an existing permittee and request the permittee's acquiescence. If the permittee is unwilling to acquiesce, the Forest Service must wait and propose a new permit when the existing permit expires, or must revoke the existing permit in accordance with its statutory and regulatory powers, such as the powers detailed in of 36 C.F.R. § 222.4.[9] Thus, McKeen's ability to seek meaningful judicial review of the cancellation of his previously permitted numbers was not unilaterally foreclosed by the issuance of a new permit in

---

[9] Pursuant to 36 C.F.R. § 222.3(c)(1)(iii), "[i]n order to update terms and conditions, term permits may [also] be cancelled at the end of the calendar year of the midyear of the decade (1985, 1995, etc.), provided they are reissued to the existing permit holder for a new term of 10 years." This regulation is, however, irrelevant to McKeen's argument.

24

February of 2004. Rather, McKeen acquiesced in the cancellation, even if "under protest."

Moreover, in order for McKeen's alleged injury to be truly "capable of repetition, yet evading review," he must demonstrate a reasonable expectation that the Forest Service will, in the future, take an action which relates to his permit so close in time to the expiration of that permit that he will be precluded from seeking effective judicial review. He has failed to do so. Indeed, in light of the fact that McKeen seems to misunderstand the limitations on a District Ranger's ability to issue a superseding permit, see Aplt. Resp. to Show Cause at 13 ("It is not unreasonable to believe that [the Forest Service] could take action against a term grazing permit and then *immediately* issue a new term grazing permit which relied upon the administrative action." (emphasis added)), he has made no credible suggestion that the Forest Service is likely to subject him to similar actions in the future.

In sum, we have no power to set aside the term grazing permit McKeen and the Glenwood District Ranger agreed to in February of 2004 and thus, any declaration regarding the cancellation of McKeen's prior permitted numbers would be of no effect in the real world. Thus, this issue is moot.[10] See Wyoming,

---

[10] Because it is moot, we express no opinion as to the merits of McKeen's § 558(c) claim. We note, however, that in Buckingham, the Ninth Circuit rejected a similar claim presented by a Forest Service grazing permittee. There, the

(continued...)

25

587 F.3d at 1250; see also Wallace v. Bureau of Land Mgmt., 169 F. App'x 521, 523-24 (10th Cir. 2006) (concluding that a plaintiff's challenge to a BLM decision which affected an expired BLM grazing permit was moot). Further, McKeen's claim does not fit into the "capable of repetition, yet evading review" exception. Accordingly, we vacate the district court's judgment with respect to this issue and remand with instructions to dismiss the issue as moot. See Kan. Judicial Review v. Stout, 562 F.3d 1240, 1248 (10th Cir. 2009) ("When a case becomes moot on appeal, the ordinary course is to vacate the judgment below and remand with directions to dismiss.").

---

[10](...continued)
permittee "commenced what became a persistent pattern of permit violations," Buckingham, 603 F.3d at 1078, leading the Forest Service to first cancel 25% of his permitted numbers and eventually to permanently cancel his permit all together. In challenging the ultimate cancellation of his permit, the permittee argued, *inter alia*, "that the Forest Service [had] failed to give him notice and an opportunity to demonstrate or achieve compliance with his permit, in accordance with the APA, 5 U.S.C. § 558(c)." Id. at 1084-85. More specifically, the permittee alleged that each instance of his non-compliance "renewed the Forest Service's obligations under § 558(c), requiring the Forest Service to give [him] a new opportunity to achieve compliance with those specific violations." Id. at 1086.

In rejecting this claim, the Ninth Circuit noted that if "[the permittee's proposed] approach were adopted, it is difficult to see how the Forest Service, after documenting one permit violation, would ever be able to actually render an adverse decision related to a grazing permit, because each new violation would restart the clock for the permittee to comply." Id. Indeed, the Ninth Circuit explained that pursuant to such an approach, there would be a "bottomless vortex of red tape, consisting of Forest Service issuance of notice of non-compliance, permittee corrective action, Forest Service verification, followed by another violation of the same term or condition by the permittee, and so forth." Id. (quotation, citation, and alteration omitted).

26

*Did the Forest Service act in an arbitrary and capricious manner and/or abuse its discretion in issuing, modifying, and/or implementing its September 27, 2002 Decision Notice?*

McKeen presented several arguments to the district court in support of his request that the September 27, 2002 Decision Notice, and/or the Forest Service's modification and implementation of that Decision Notice, be set aside pursuant to 5 U.S.C. § 706(2). First, McKeen argued that the Glenwood District Ranger acted arbitrarily and capriciously in adopting the Decision Notice because he "propose[d] a range analysis scheme which ignores the Congressional mandate [of the Public Rangelands Improvement Act of 1978, 43 U.S.C. §§ 1901-1908, and the Federal Land Policy Management Act of 1976, 43 U.S.C. § 1701, et seq.] to inventory and identify public rangeland conditions and trends." See Aplt. App. at 85. Second, McKeen claimed that the Glenwood District Ranger acted arbitrarily and capriciously because by adopting an unsuitable monitoring methodology and including issues in the Decision Notice that had not been "discussed collaboratively," the Glenwood District Ranger "failed to insure the professional integrity, including the scientific integrity, of the discussions and analysis," in contravention of the duties imposed on it by the Data Quality Act[11] and NEPA.

_____

[11] The Data Quality Act, see Pub. L. No. 106-554, § 1(a)(3), 114 Stat. 2763, 2763A-153 (2000) (codified as a note to 44 U.S.C. § 3516), "orders the Office of Management and Budget to draft guidelines concerning information quality and specifies what those guidelines should contain." Salt Inst. v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006).

27

See id. at 86-87. Finally, McKeen alleged that the Forest Service acted arbitrarily and capriciously and/or abused its discretion in implementing the Decision Notice because it "did not follow the necessary monitoring process to implement [the stubble height methodology adopted in the Decision Notice]" and because it "failed to approve the projects, fund its share of the projects, or provide the materials it agreed to provide" pursuant to the mediation agreement McKeen reached with the Glenwood District Ranger on July 27, 2001. See id. at 87-88.

In addressing McKeen's first two arguments, the district court acknowledged that "the issuance of a decision notice under NEPA constitutes a 'final agency action' that is subject to judicial review under the APA," see id. at 211 (citing Catron County Bd. of Comm'rs v. U.S. Fish & Wildlife Serv., 75 F.3d 1429, 1434 (10th Cir. 1996)), but concluded that its "careful review of the record d[id] not reveal a basis for setting aside the [Glenwood] District Ranger's Decision Notice of September 27, 2002, under the standard articulated in Section 706 of the APA," id. at 216. Specifically, the district court noted that McKeen's objections to the stubble-height methodology were without merit because (1) McKeen relied on "evidence that did not exist and was not before the agency at the time of its decision," id. at 215, (2) there was "substantial evidence [in the administrative record] to support the agency's use of stubble-height measurements as a range-management tool," id. at 216, and (3) "the Decision Notice . . . does not rely on stubble-height measurements *alone* as a substitute or replacement for

28

other forms of rangeland monitoring,"[12] id. (emphasis in original).

The district court also rejected the challenges McKeen raised to the Forest Service's modification and implementation of the Decision Notice. First, the district court noted that "[t]o the extent that [the May 22, 2006] permit modifications were granted at [McKeen's] request, he is not 'adversely affected or aggrieved' by them within the meaning of the APA." Id. at 218. The district court then noted that McKeen had failed to identify any other "final agency action" which he opposed and that "the conclusory references to [fencing, monitoring, and range improvement] activities in [McKeen's] opening brief fail[ed] to provide any lawful basis for setting aside the agency's decision-making under the APA." See id. at 221-22.

On appeal, McKeen appears to re-urge each of the arguments rejected by the district court. First, McKeen argues that the September 27, 2002 Decision Notice was arbitrary and capricious because it "was supposed to be a collaborative effort involving the [Forest Service] Interdisciplinary ("ID") Team, the New Mexico Department of Agriculture, Vic Jenkins (a range conservationist/consultant), and Mr. McKeen (hereinafter collectively referred to as 'the planning group')," but "there were issues included in the Decision Notice . . . that had not been discussed by the planning group and that were not based on

---

[12] The district court did not, however, address McKeen's contention that the Decision Notice contained "issues" that had not been "discussed collaboratively."

29

range science and data." Aplt. Op. Br. at 39-40. And second, McKeen summarily alleges that "[i]n implementing the [Decision Notice], and making modifications to it, the [Forest Service] has failed to approve the needed range improvement projects, fund its share of the projects, or provide the materials it agreed to provide," and that "[t]hese failures are arbitrary and capricious . . . ." Id. at 43-44.

As an initial matter, the Forest Service contends that because McKeen did not raise the failure to consult argument to the district court, he has waived it.[13] McKeen, by contrast, notes that in a November 9, 2002 letter which he sent to the Gila Forest Supervisor, he explained that in his opinion, "[a]ll of the . . . improvements [listed in the Decision Notice] need to be discussed on the ground so that all parties understand where they are to be built, who provides what and what the benefits are," see Aplt. App. at 452, and he claims that the issue was "properly raised at the district court level in the Complaint, as well as in the Plaintiff's Opening Brief to the district court," see Reply Br. at 12 (citation omitted).

Whether or not McKeen adequately preserved this argument is, however, of little significance because McKeen has never explained, either to the district court

---

[13] The Forest Service argues, in the alternative, that "McKeen is incorrect to suggest . . . that he was not consulted prior to the inclusion of these items in the Decision Notice." Resp. Br. at 44.

30

or to this court, how his allegation that the "planning committee" was not consulted, if true, provides any grounds to set aside the September 27, 2002 Decision Notice pursuant to § 706(2).[14] McKeen has not, for example, alleged or demonstrated that the Forest Service's failure to consult the "planning committee" was in contravention of NEPA, see Morris v. U.S. Nuclear Regulatory Comm'n, 598 F.3d 677, 690 (10th Cir. 2010) (noting that an agency's compliance with NEPA is reviewed under § 706(2) of the APA); see also Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 72 (2004) ("Before addressing whether a NEPA-required duty is actionable under the APA, we must decide whether NEPA creates an obligation in the first place."), or in contravention of statutory authority, see 43 U.S.C. § 1752(d) ("If the Secretary concerned elects to develop an allotment management plan for a given area, he shall do so in careful and considered consultation, cooperation and coordination with the lessees, permittees, and landowners involved . . . ."), or regulation, see 36 C.F.R. § 222.2(b) ("Each allotment will be analyzed and with careful and considered consultation and cooperation with the affected permittees, landowners, and grazing advisory boards involved, as well as the State having land within the area covered, and an allotment management plan developed."). Nor has McKeen

---

[14] Our decision to refrain from deciding whether McKeen has waived this argument is also influenced by the fact that in its briefing to the district court, the Forest Service did not address McKeen's failure to consult argument and has thus, arguably waived the waiver argument it now presents.

31

demonstrated that the failure to consult the "planning committee" somehow led the Forest Service to render an arbitrary and capricious decision in some other manner. Accordingly, we conclude that the Forest Service's alleged failure to consult with the "planning committee" does not provide a basis for setting aside the September 27, 2002 Decision Notice pursuant to § 706(2) of the APA.

McKeen's next argument is that the Decision Notice is arbitrary and capricious because it contains "issues . . . that were not based on range science and data." See Aplt. Op. Br. at 40. Because McKeen does not elaborate on this contention in his appellate briefing, the Forest Service alleges that this sentence cannot be construed as a re-urging of McKeen's challenge to the adoption of the stubble-height methodology either in the 2002 Decision Notice or in McKeen's 2004 grazing permit and concomitant AOIs. The Forest Service is correct in this regard. Indeed, neither McKeen's Opening Brief, nor his Reply Brief to this court makes any mention of the scientific efficacy of the stubble-height methodology. Accordingly, we conclude that McKeen has waived any appeal of this issue. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").

The next challenge McKeen raises to the September 27, 2002 Decision Notice relates to the May 22, 2006 letter in which the Glenwood District Ranger amended McKeen's 2004 term grazing permit. In addressing these arguments, we note, as an initial matter, that McKeen has never administratively appealed the

32

amendments made by the May 22, 2006 letter. Rather, in an October 10, 2006 letter to the District Ranger, McKeen noted that he "appreciate[d] the amendments" to his permit and that in his opinion "[t]he changes . . . are common sense." Aplt. App. at 590. Accordingly, McKeen has waived any arguments which relate to the modifications to his term grazing permit effected by the May 22, 2006 letter. See 7 U.S.C. § 6912(e); Forest Guardians, 579 F.3d at 1120. Moreover, to the extent that McKeen has preserved an appeal of the amendments made by the May 22, 2006 letter, that appeal is without merit because McKeen never presented his request that the Decision Notice be "remand[ed] . . . to the [Forest Service], with instructions to make any modifications to that [Decision Notice] in an appealable decision document," Aplt. Op. Br. at 45, to the district court, see Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co., 497 F.3d 1135, 1141 (10th Cir. 2007) ("This Court will not consider a new theory advanced for the first time as an appellate issue, even a theory that is related to one that was presented to the district court."), nor has he challenged the district court's conclusion that he was not "adversely affected or aggrieved" by the permit modifications within the meaning of the APA.

The final series of challenges that McKeen poses to the September 27, 2002 Decision Notice relate to what McKeen describes as its implementation. Specifically, McKeen alleges that "[i]n implementing the [Decision Notice] . . . the [Forest Service] has failed to approve the needed range improvement projects,

33

fund its share of the projects, or provide the materials it agreed to provide" and that "[t]hese failures are arbitrary and capricious." See Aplt. Op. Br. at 43-44. However, rather than identify any discrete action of the Forest Service which he challenges, McKeen continues to make broad, conclusory statements regarding the implementation of the Decision Notice. Even after a careful reading of McKeen's briefing and the record, it is simply impossible to determine precisely what Forest Service actions he believes have aggrieved him in this regard, and forest "monitoring and management practices are reviewable [only] when, and to the extent that, they affect the lawfulness of a particular final agency action." See Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1067 (9th Cir. 2002).

## III

The district court's grant of summary judgment is AFFIRMED with respect to McKeen's requests for relief which relate to the September 27, 2002 Decision Notice. The district court's grant of summary judgment is VACATED with respect to McKeen's request for relief which relates to the cancellation of his previously permitted grazing numbers, and we REMAND to the district court with instructions to DISMISS this claim as moot.