**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 5, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STATE OF WYOMING,

     Petitioner - Appellant,

PARK COUNTY BOARD OF
COUNTY COMMISSIONERS,

     Petitioner,

and

INTERNATIONAL SNOWMOBILE
MANUFACTURERS ASSOCIATION,
INC.,

     Plaintiff-Intervenor,

v.

UNITED STATES DEPARTMENT
OF INTERIOR; KEN SALAZAR, in
his official capacity as Secretary of the
United States Department of the
Interior; JON JARVIS, in his official
capacity as National Park Service
Director; MICHAEL SNYDER, in his
official capacity as National Park
Service Intermountain Regional
Director, NATIONAL PARK
SERVICE,

     Respondents - Appellees,

and

No. 10-8088

NATIONAL PARKS
CONSERVATION ASSOCIATION,

      Respondent-Intervenor -
      Appellee.

---

STATE OF WYOMING,

      Petitioner,

PARK COUNTY BOARD OF
COUNTY COMMISSIONERS,

      Petitioner - Appellant,

INTERNATIONAL SNOWMOBILE
MANUFACTURERS ASSOCIATION,
INC.,

      Plaintiff-Intervenor,

v.

UNITED STATES DEPARTMENT
OF INTERIOR; NATIONAL PARK
SERVICE; JON JARVIS, in his
official capacity as National Park
Service Director; MICHAEL
SNYDER, in his official capacity as
Intermountain Regional Director,
National Park Service; KEN
SALAZAR,

      Respondents - Appellees,

and

NATIONAL PARKS
CONSERVATION ASSOCIATION,

      Respondent-Intervenor -

No. 10-8089

2

Appellee.

PARK COUNTY BOARD OF
COUNTY COMMISSIONERS,

     Petitioner,

INTERNATIONAL SNOWMOBILE
MANUFACTURERS ASSOCIATION,
INC.,

     Plaintiff-Intervenor - Appellant,

v.

JON JARVIS, in his official capacity
as Director of the National Park
Service Director; KEN SALAZAR, in
his official capacity as Secretary of the
United States Department of the
Interior; MICHAEL SNYDER, in his
official capacity as Intermountain
Regional Director, National Park
Service; UNITED STATES
DEPARTMENT OF INTERIOR,

     Respondents,

and

NATIONAL PARKS
CONSERVATION ASSOCIATION,

     Respondent-Intervenor -
Appellee.

No. 10-8090

---

**ORDER**

---

Before **BRISCOE**, Chief Judge, **BALDOCK**, and **HOLMES**, Circuit Judges.

---

3

This matter is before the court on the appellant's petition for rehearing. Upon consideration, the petition is granted. The court's original decision dated February 29, 2012, is withdrawn. An amended decision is attached to this order and shall be shown filed as of today's date. The mandate issued February 29, 2012, is hereby recalled.

Entered for the Court

Elisabeth A. Shumaker, Clerk

4

FILED
United States Court of Appeals
Tenth Circuit

April 5, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

STATE OF WYOMING,

    Petitioner - Appellant,

PARK COUNTY BOARD OF
COUNTY COMMISSIONERS,

    Petitioner,

and

INTERNATIONAL SNOWMOBILE
MANUFACTURERS ASSOCIATION,
INC.,

    Plaintiff-Intervenor,

v.

UNITED STATES DEPARTMENT
OF INTERIOR; KEN SALAZAR, in
his official capacity as Secretary of the
United States Department of the
Interior; JON JARVIS, in his official
capacity as National Park Service
Director; MICHAEL SNYDER, in his
official capacity as National Park
Service Intermountain Regional
Director, NATIONAL PARK
SERVICE,

    Respondents - Appellees,

and

No. 10-8088

NATIONAL PARKS
CONSERVATION ASSOCIATION,

     Respondent-Intervenor -
Appellee.

_____

STATE OF WYOMING,

     Petitioner,

PARK COUNTY BOARD OF
COUNTY COMMISSIONERS,

     Petitioner - Appellant,

INTERNATIONAL SNOWMOBILE
MANUFACTURERS ASSOCIATION,
INC.,

     Plaintiff-Intervenor,

v.

UNITED STATES DEPARTMENT
OF INTERIOR; NATIONAL PARK
SERVICE; JON JARVIS, in his
official capacity as National Park
Service Director; MICHAEL
SNYDER, in his official capacity as
Intermountain Regional Director,
National Park Service; KEN
SALAZAR,

     Respondents - Appellees,

and

NATIONAL PARKS
CONSERVATION ASSOCIATION,

     Respondent-Intervenor -

No. 10-8089

2

Appellee.

PARK COUNTY BOARD OF
COUNTY COMMISSIONERS,

      Petitioner,

INTERNATIONAL SNOWMOBILE
MANUFACTURERS ASSOCIATION,
INC.,

      Plaintiff-Intervenor - Appellant,

v.

JON JARVIS, in his official capacity
as Director of the National Park
Service Director; KEN SALAZAR, in
his official capacity as Secretary of the
United States Department of the
Interior; MICHAEL SNYDER, in his
official capacity as Intermountain
Regional Director, National Park
Service; UNITED STATES
DEPARTMENT OF INTERIOR,

      Respondents,

and

NATIONAL PARKS
CONSERVATION ASSOCIATION,

      Respondent-Intervenor -
      Appellee.

No. 10-8090

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. Nos. 2:09-CV-00262-ABJ; 2:09-CV-00272-ABJ)**

3

James Kaste, Senior Assistant Attorney General, Cheyenne, Wyoming, and James Davis, Deputy Park County Attorney, Cody, Wyoming (Jay Jerde, Deputy Attorney General, Cheyenne, Wyoming, Bryan A. Skoric, Park County Attorney, Cody, Wyoming, with them on the brief), for Petitioners-Appellants.

(William P. Horn, Birch Horton Bittner & Cherot, PC, Washington D.C., Harriet M. Hageman, Hageman & Brighton, Cheyenne, Wyoming, on the brief for Petitioner-Intervenor-Appellant).

Andrew Mergen, United States Department of Justice (Ignacia S. Moreno, Assistant Attorney General, Aaron P. Avila and Justin R. Pidot, United States Department of Justice, with him on the brief), Washington, D.C., for Respondents-Appellees.

Robert D. Rosenbaum (Brett E. Marston and Holly E. Sterrett, with him on the brief), Arnold & Porter LLP, Washington, D.C., for Respondent-Intervenor-Appellee.

---

Before **BRISCOE**, Chief Judge, **BALDOCK**, and **HOLMES**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

In 1974, the National Park Service (NPS) adopted a default rule prohibiting the use of snowmobiles in all national parks except on designated routes. 36 C.F.R. § 2.18(c). Pursuant to the default rule, NPS must promulgate a special regulation designating specific routes open to snowmobile use in a particular national park. Absent such a rule, no snowmobiles are allowed. See id. ("Snowmobiles are prohibited except where designated."). NPS originally regulated designated routes, choosing not to set a limit on the number of snowmobiles permitted in the parks. 36 C.F.R. § 7.13(l)(2) (2000). In 1997, environmental and recreational groups began seeking to limit the daily number of snowmobiles permitted in Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller Jr. Memorial Parkway

4

(collectively, the parks). And over the past fifteen years, groups have continued to litigate the fate of snowmobiles in the parks. In the present cases, Petitioners the State of Wyoming and Park County, Wyoming filed petitions for review of agency action, challenging the 2009 rules governing snowmobile use in the parks.[1] The district court dismissed the petitions for review, holding Petitioners lacked standing to pursue their claims. On appeal, Petitioners ask us again to weigh in on this ongoing saga. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part, vacate in part, and remand.

## I.

Our story begins in 1997 when snowmobile opponents sought to limit the number of snowmobiles entering the parks. The opponents brought their challenge to NPS policy in a Washington, D.C. district court. Fund for Animals, Inc. v. Babbitt, No. 1:97-CV-1126 (D.D.C. filed May 20, 1997). The civil action resulted in a settlement where NPS adopted the 2001 rule, which provided for a complete phase-out of snowmobiles in the parks after the 2003–04 winter season. 66 Fed. Reg. 7260 (Jan. 22, 2001). Snowmobile proponents subsequently filed suit in a Wyoming district court challenging the 2001 rule. Int'l Snowmobile Mfrs. Ass'n v. U.S. Dep't of Interior Sec'y, No. 2:00-CV-229 (D. Wyo. filed Dec. 6, 2000). This

---

[1] Wyoming and Park County filed separate petitions for review. The district court then consolidated the two civil actions. Subsequently, the district court granted the International Snowmobile Manufacturers Association's (ISMA) motion to intervene. After the district court dismissed the petitions, Wyoming, Park County, and ISMA all filed separate appeals. We consolidated the appeals for procedural purposes.

5

litigation again resulted in a settlement. But instead of a snowmobile phase-out, the settlement in the Wyoming action resulted in NPS promulgating the 2003 rule, allowing 950 snowmobiles per day into Yellowstone, 75 on the Continental Divide Snowmobile Trail and 75 on Grassy Lake Road in Grand Teton and the Parkway, and 40 on Jackson Lake in Grand Teton. 68 Fed. Reg. 69268 (Dec. 11, 2003). The 2003 rule led to a third round of litigation, again brought by the snowmobile opponents in a Washington, D.C. district court. The D.C. court invalidated the 2003 rule and reinstated the 2001 rule. The Fund for Animals v. Norton, 294 F. Supp. 2d 92, 115 (D.D.C. 2003). Thereafter, the proponents filed a fourth lawsuit in Wyoming. The Wyoming court invalidated the 2001 rule, concluding NPS violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06, in promulgating the 2001 rule. Int'l Snowmobile Mfrs. Ass'n v. Norton, 340 F. Supp. 2d 1249, 1266 (D. Wyo. 2004).

In 2004, NPS promulgated a temporary rule which contained a "sunset clause," providing its snowmobile authorization would expire at the conclusion of the 2006–07 winter season. The 2004 temporary rule authorized 720 snowmobiles per day in Yellowstone, 50 per day on the Continental Divide Snowmobile Trail, 50 per day on Grassy Lake Road, and 40 per day on Jackson Lake. 69 Fed. Reg. 65348 (Nov. 10, 2004). The 2004 temporary rule triggered litigation by the opponents in Washington D.C. and the proponents in Wyoming. The temporary rule survived both challenges. The Fund for Animals v. Norton, 390 F. Supp. 2d 12 (D.D.C. 2005); Wyo. Lodging and Rest. Ass'n v. U.S. Dep't of Interior, 398 F. Supp. 2d 1197 (D.

6

Wyo. 2005). After the 2004 temporary rule expired under the sunset provision, NPS promulgated what it intended to be a permanent rule in 2007. The 2007 rule allowed 540 snowmobiles per day in Yellowstone, 0 per day on the Continental Divide Snowmobile Trail, 25 per day on Grassy Lake Road, and 40 per day on Jackson Lake. 72 Fed. Reg. 70781 (Dec. 13, 2007). Unsurprisingly, the proponents and opponents again filed simultaneous challenges in Wyoming and Washington, D.C., respectively. The Washington, D.C. court ruled first, holding the 2007 rule arbitrary and capricious. Greater Yellowstone Coal. v. Kempthorne, 577 F. Supp. 2d 183, 210 (D.D.C. 2008). Although the Washington, D.C. court believed the 2007 rule allowed too many snowmobiles in the parks, the court did not set forth a maximum number of snowmobiles that could enter the parks while NPS worked to promulgate a new rule. Thereafter, the Wyoming court issued an order stating its disagreement with the Washington, D.C. court's ruling, but declining to issue a ruling contrary to that of the D.C. court. Wyoming v. U.S. Dep't of Interior, No. 2:07-CV-319, Order Implementing Temporary Remedy and Granting Motion to Intervene (D. Wyo. Nov. 7, 2008). Because the Wyoming court believed the D.C. court's ruling did not address what should happen to snowmobiles in the parks while NPS formulated a new rule, the Wyoming court held the 2004 rule, as the last valid rule, should be reinstated until NPS could promulgate a new rule. Id. While the litigation regarding the 2007 rule was ongoing, NPS began work on a new rule.

The Wyoming court's ruling reinstating the 2004 rule became the first decision to reach an appellate court. The issue before us was whether the district court had

the power to order the interim remedial order reinstating the 2004 rule. Before we issued a decision, NPS published the 2009 rules. Subsequently, we found the Wyoming case moot because, after NPS issued the 2009 rules, we could offer the parties no effective relief. Wyoming v. U.S. Dep't of Interior, 587 F.3d 1245, 1247 (10th Cir. 2009). That brings us to the instant civil action—Petitioners' challenge to the 2009 rules.

## II.

The National Environmental Policy Act (NEPA), 42 U.S.C §§ 4331–71 requires that "major Federal actions significantly affecting the quality of the human environment . . . be preceded by an environmental impact statement or EIS." McKeen v. U.S. Forest Serv., 615 F.3d 1244, 1248 n.3 (10th Cir. 2010) (internal citation omitted). "Before creating an EIS, however, a government agency may prepare a document called an environmental assessment (EA)." Id. The agency may conclude after preparing the EA that a proposed action will not significantly affect the environment. In that case, "the agency may issue a finding of no significant impact (FONSI) and need not prepare a full EIS." Id.

In this case, NPS prepared an EA in 2008 with the stated purposes of ensuring (1) park visitors had a range of appropriate winter recreational opportunities for an interim period and (2) recreational activities in the parks did not impair or unacceptably impact park resources or values. In the EA, NPS formulated two alternatives for snowmobile use in response to monitoring and studies, prior litigation, past public comments, and past winter planning processes. Alternative 1

8

proposed elimination of snowmobiles in the parks. Despite the 2004 temporary rule allowing 720 snowmobiles per day into Yellowstone at the time NPS wrote the EA, NPS believed the 2004 temporary rule expired at the end of the 2007 winter season and, in the absence of agency action, snowmobiles were no longer authorized. Thus, the agency labeled Alternative 1 a "No Action" alternative. In contrast, Alternative 2 proposed allowing 318 snowmobiles per day in Yellowstone and 50 snowmobiles per day in Grand Teton. NPS asserted the numbers selected in Alternative 2 reflected the recent snowmobile use trends in the parks.

Concluding that neither alternative would pose any significant adverse impacts on the environment, NPS issued a FONSI for both Yellowstone and Grand Teton adopting Alternative 2. NPS promulgated a permanent rule for Grand Teton, but rather than issue a permanent rule for Yellowstone, NPS decided to promulgate a temporary rule for the 2009–10 and 2010–11 winter seasons to replace the reinstated 2004 rule while NPS determined "a long-term strategy for Yellowstone winter use." 74 Fed. Reg. 60159, 60160 (Nov. 20, 2009). As discussed above, the 2009 temporary rule provided for 318 snowmobiles per day in Yellowstone and imposed a commercial guide requirement for snowmobilers. Id. On March 15, 2011, the 2009 temporary rule for Yellowstone, by its own terms, expired. The permanent rule for Grand Teton allows for 25 snowmobiles per day on the Grassy Lake Road and 25 snowmobiles per day on Jackson Lake. Id. The 2009 permanent rule as to Grand Teton also closes the Continental Divide Snowmobile Trail and, like the Yellowstone temporary rule, imposes a commercial guide requirement for snowmobilers in the

9

park. Id.

Petitioners Wyoming and Park County filed separate petitions for review of agency action in the District of Wyoming challenging both the substance of the 2009 rules and the sufficiency of Respondents' analysis during the rules' promulgation procedure.[2] *Substantively*, Petitioners asserted the 2009 winter use plans violated the National Park Service Organic Act, 16 U.S.C. § 1, and the statutes establishing Yellowstone and Grand Teton, 16 U.S.C. §§ 21–40, 406d-1, by arbitrarily restricting snowmobile access in spite of evidence which demonstrates that NPS could permit more snowmobiles without causing unacceptable impacts or impairment to park resources.[3] *Procedurally*, Petitioners posited the 2009 rules arbitrarily and capriciously limit the daily number of snowmobiles into the parks in violation of the APA. Specifically, Petitioners argued Respondents ignored scientific evidence regarding snowmobile use in the parks and fashioned a rule that will systematically

---

[2] The district court granted the International Snowmobile Association's ("ISMA") motion to intervene on the side of the Petitioners and National Park Conservation Association's motion to intervene on the side of the Respondents. ISMA represented to the district court that it intended to rely on the standing of Wyoming and Park County. See Stewart v. Kempthorne, 554 F.3d 1245, 1253 (10th Cir. 2009) ("[I]ntervenors need not establish standing in their own right provided they are aligned with another party with constitutional standing."). ISMA did not appear at oral argument, but joined in the brief with Wyoming and Park County.

[3] Congress established NPS in 16 U.S.C. § 1, granting NPS the authority to promote and regulate the use of the national parks "by such means and measures as conform to the fundamental purpose of the said parks . . . which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1.

exclude thousands of snowmobilers from the parks. Finally, Petitioners alleged NPS violated NEPA by failing to consider a reasonable range of alternatives or to provide a reasoned explanation for the restriction on the number of snowmobile entries. Wyoming also alleged NPS violated NEPA by failing to take a "hard look" at the environmental consequences of the 2009 rules.

Intervenor-Respondent National Parks Conservation Association ("NPCA") then filed a motion to dismiss the petition for a lack of standing. NPCA argued a state and a county do not have standing, as *parens patriae* on behalf of their citizens, to bring an action against the federal government and the petitions offered no hint of any basis for standing other than the protection of the state and county's citizens. Park County and Wyoming filed separate responses in opposition, each attaching affidavits in support of standing. Park County maintained standing exists because the NPS regulation impacts the amount of sales tax collected. The sales tax money flows to Park County's "general fund," which the county uses to provide public services and to subsidize its advertising budget. Moreover, Park County argued it not only suffers a loss to its sales tax revenues, but also gains the responsibility of caring for increased use and physical environmental impacts on roads and land from displaced Yellowstone snowmobilers. Park County also attached an affidavit declaring the commercial guide requirement reduces interest in snowmobiling in Yellowstone, which results in a further decrease in sales tax revenue. Additionally, Park County contends demand to enter Yellowstone through the East Gate is greater than the maximum daily limit of 20 per day the 2009 temporary rule mandates. Park

11

County pointed the district court to 2001 statistics which show an average of 41 entries per day from the East Gate. Finally, as to NEPA, Park County claimed it has a geographical nexus to Yellowstone based on the park's location within Park County.

Wyoming agreed with NCPA that its standing could not be brought as *parens patriae* on behalf of its citizens. Instead, Wyoming claimed it asserted a sovereign and proprietary interest in the health of its tourism industry and further maintained the daily limit on snowmobiles, commercial guide requirements, and continued uncertainty for future seasons discouraged and reduced the number of snowmobilers to the parks to the economic detriment of the state. Wyoming also suggested "displacement impacts" from the parks onto the adjacent National Forests provide standing for Wyoming's NEPA claims because displacement of snowmobilers from the National Parks to the National Forests creates a significant increase in the management, grooming and trail upkeep responsibilities for the state-run Wyoming Trails Program. Wyoming further alleged displacement interferes with Wyoming's sovereign interest in the management of wildlife within its borders, including management of the fishery at Jackson Lake in Grand Teton. Wyoming also asserted a sovereign regulatory interest in the air quality of the parks, maintaining the 2009 rules conflicted and interfered with Wyoming's regulatory authority over air quality matters within its borders. In addition, Wyoming and Park County both alleged an interest in the litigation because of their heavy involvement in the NEPA processes that led to the 2009 rules.

NPCA, in reply, also presented the district court an affidavit and evidence to show a lack of standing. Specifically, NPCA argued Petitioners' tax and fees arguments were based on speculation and out-dated data. NPCA's evidence showed a negative correlation between tourism in Park County and the number of snowmobiles going into Yellowstone's East Entrance. Regardless of the data, NPCA urged the district court to find Petitioners lacked standing because the loss of tax receipts is not a valid basis for standing. NPCA also stated the district court should discredit the displacement argument because Petitioners irrationally desire to simply shift the environmental harm from the National Forests to the National Parks, which are both within the boundaries of the state.

The district court granted NPCA's motion, concluding Petitioners did not allege sufficient facts to establish it had a procedural NEPA injury. Bd. of Cnty. Comm'rs of Cnty. of Park v. U.S. Dep't of Interior, 2010 WL 6429153, *17 (D. Wyo. Sept. 17, 2010). Specifically, the court held Petitioners did not allege any increased risk of environmental harm resulting from any alleged uninformed agency decision. Id. Additionally, as to Petitioner's alleged loss of tourism and tax revenues, the district court concluded the alleged injuries were not only generalized grievances, but also speculative and hypothetical economic interests not sufficient to demonstrate an injury to concrete interest independent of Petitioners' citizens. Id.

III.

On appeal, Petitioners first assert the district court failed to afford Wyoming "special solicitude" in its standing analysis. Particularly, Petitioners acknowledge

13

that where, as here, petitioners are not themselves the object of the government action they challenge, standing is ordinarily substantially more difficult to establish. Petitioners suggest this creates a "heightened" burden of proof, which the "special solicitude" doctrine negates as to the states. Next, Petitioners maintain the district court erred by dismissing the petitions without considering whether Petitioners had standing pursuant to the Organic Acts. Petitioners assert their economic interests are significantly and directly injured by NPS's alleged violation of the Organic Acts because each snowmobile entry into the parks corresponds to tax revenues for Petitioners. Thus, Petitioners contend any new restrictions on access the 2009 rules impose cause them real harm. Petitioners also allege injury to their proprietary and sovereign interests from loss of revenue resulting from commercial guide requirements and continued uncertainty regarding future seasons; the health of their tourism industry; environmental effects from displacement of snowmobiles; and management of the fishery at Jackson Lake.

Moreover, Petitioners suggest the district court ignored this Court's precedent "that state and local governments have standing to assert claims that the unlawful conduct of a federal agency results in lost tax revenues." Finally, Petitioners argue the court erred in declaring Petitioners asserted no NEPA injuries. Petitioners state they have an obvious geographical nexus to the site of the agency action because the parks are within the boundaries of Wyoming and Park County.

In contrast, Respondents contend the federal government, not Petitioners, represent the citizens of Wyoming and Park County as *parens patriae*. Thus,

14

Petitioners cannot base standing on allegations that a federal action incidentally results in a reduction in tax revenue. Respondents assert even if Petitioners could have standing for actions that incidentally reduce tax revenue, the district court properly found the alleged economic consequences of the 2009 rules too speculative to support standing. Respondents further contend Petitioners failed to establish a concrete interest sufficient to support standing pursuant to NEPA.

Notwithstanding the foregoing, in their briefs and at oral argument, Respondents contended this civil action is moot. As mentioned above, the 2009 temporary rule for Yellowstone expired by its own terms on March 15, 2011, prior to oral argument in this case. Although NPS intended to have a permanent rule in place for Yellowstone for the 2011–12 winter season, it did not meet its goal. Instead, NPS implemented a one-year rule for the 2011–12 winter season which, in substance, keeps in place the 2009 temporary rule at issue in this case. 76 Fed. Reg. 77131 (Dec. 12, 2011). After NPS decided to reinstate the 2009 temporary rule for the 2011–12 winter season, Respondents filed a Fed. R. App. P. 28(j) letter, in which they abandoned their mootness argument. Because this issue goes to our jurisdiction to hear the case, however, we must address mootness before we turn to standing.

IV.

The Constitution limits our jurisdiction to the adjudication of "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. A controversy "must exist during all stages of the appellate review," and if that controversy ceases to exist, "the action is moot and this court lacks jurisdiction to adjudicate the matter." United States v.

15

Seminole Nation, 321 F.3d 939, 943 (10th Cir. 2002). In this case, the Yellowstone 2009 temporary rule expired by its own terms on March 15, 2011.[4] NPS, however, essentially has kept the substance of the 2009 rule in place as a "one-year rule" for the 2011–12 winter season. Thus, Petitioners argue this controversy falls under the capable of repetition, yet evading review exception. We have said this exception applies if two prerequisites are satisfied: "(1) the duration of the challenged action must be too short to be fully litigated prior to its cessation or expiration; and (2) there must be a reasonable expectation that the same complaining party will be subjected to the same action again." Hain v. Mullin, 327 F.3d 1177, 1180 (10th Cir. 2003) (en banc). Although we agree with Petitioners the substantive challenge is not moot, we believe Petitioners' procedural challenge is moot.

A.

We first address Petitioners' substantive challenge. The capable of repetition, yet evading review exception is a "narrow" exception that should only be used in "exceptional situations." Jordan v. Sosa, 654 F.3d 1012, 1034–35 (10th Cir. 2011). The party seeking to avoid mootness must proffer "evidence from which we might infer that this . . . [governmental] behavior is *necessarily* of short duration." Id. at 1036. As the Third Circuit has noted: "Most cases utilizing this [exception] have involved official action that *by its very nature* could not, or probably would not be able to be adjudicated while fully 'live.'" Dow Chemical Co. v. EPA, 605 F.2d 673,

---

[4] The Grand Teton permanent rule is not subject to mootness analysis because, as mentioned earlier, it is a permanent rule, rather than a temporary rule.

16

678 n.12 (3d Cir. 1979) (emphasis added). In other words, the inquiry should turn on whether something inherent exists in the nature or structure of the governmental action that makes it necessarily of short duration. See e.g., Turner v. Rogers, 131 S. Ct. 2507, 2513, 2515 (2011) (imprisonment for a statutory maximum of one year for civil contempt); Seminole Nation, 321 F.3d at 943 (temporary regulatory orders that by statute cease to be in effect no later than ninety days after issuance).

Although in the present case NPS has reinstated the features of the 2009 temporary rule for the upcoming winter season, nothing inherent in winter use plans makes them necessarily of short duration. Indeed, NPS has indicated it plans to have a long-term, final winter use plan in place by the 2012–13 winter season. Therefore, Petitioners' objections to NPS's Yellowstone winter use plan likely would not escape review if we held them to be moot here, although such review would be delayed. See Dow Chem. Co., 605 F.2d at 678 n.12.

Instead of falling into the narrow class of actions capable of repetition, yet evading review, we believe the one-year rule for the 2011–12 season is, in substance, a continuation, or a "mirror image" of, the 2009 temporary rule. Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1111 (10th Cir. 2010). In Rio Grande Silvery Minnow, we recognized, but distinguished this approach, acknowledging a regulation is capable of review where, as here, it "continues to the extent that it is only superficially altered by a subsequent regulation." Conservation Law Found. v. Evans, 360 F.3d 21, 26 (1st Cir. 2004). The Third Circuit, faced with a similar action by the EPA, declined to apply the capable of repetition, yet evading

17

review exception. <u>Dow Chem. Co.</u>, 605 F.2d at 679. In that case, the EPA withdrew its regulation for technical reasons and declared that it would resubmit the regulation. <u>Id</u>. In refusing to apply the exception, the court stated that the administrative agency had not altered its substantive stance, thus the court was reluctant "to dismiss a genuine and concrete controversy for what in this case amounts to a technical reason, brought about by the party seeking such a dismissal." <u>Id</u>. We agree with the Third Circuit's approach. Because the 2011–12 one-year rule is, in substance, a continuation of the 2009 temporary rule, we hold that Petitioners' substantive challenge under the Organic Acts to the 2009 temporary rule is not moot.

B.

Although we conclude the *substance* of the one-year rule is the same as the 2009 temporary rule, the new rule is *procedurally* distinct. The rationale of the mirror image rule in <u>Conservation Law Foundation</u> does not extend to the procedural challenge in this appeal. In <u>Conservation Law Foundation</u>, the procedural challenge involved an agency's procedural obligation to allow for notice and comment under an act and the APA. <u>Conservation Law Found.</u>, 360 F.3d at 23–24. During the appellate process, a regulation expired on its own terms. <u>Id.</u> at 24. Subsequently, the agency published a new regulation, promulgated in a different manner that allowed for notice and comment. <u>Id.</u> at 25–26. In holding the procedural challenge was not moot, the court did not rely on the mirror image rule, but rather concluded the agency's change was a voluntary cessation. <u>Id.</u> at 27 The court made that determination because the agency continued to argue the lack of notice and comment

18

for the old regulation was proper, and admitted it allowed notice and comment for the new regulation "'out of an abundance of caution' in light of th[e] appeal." Id.

In this case, NPS published a new EIS in November 2011, which supports the 2011–12 one-year rule. 77 Fed. Reg. 6581 (Feb. 8, 2012). The new rule is supported by new analysis and a rulemaking process independent of that underlying the 2009 temporary rule. Thus, any determination we might make as to the procedural foundations of the old rule "would be wholly without effect in the real word." Rio Grande Silvery Minnow, 601 F.3d at 1112. Even if we were to conclude Petitioners had standing to challenge the procedure and analysis used to adopt the 2009 rule, and if the district court then found NPS had violated NEPA or the APA in promulgating that rule, our decision would still have no effect. We reach this conclusion because the analytical and procedural aspects of the 2009 rule have been superseded by the new analysis and procedure underlying the new one-year rule. Because the procedural challenge in this case is to the analysis underlying the 2009 temporary rule and that analysis has been redone, we hold that the procedural challenge to the 2009 temporary rule is moot.

V.

Having determined Petitioners' procedural challenge pursuant to the APA and NEPA as to Yellowstone is moot, we turn to the question of Petitioners' standing to challenge the entirety of the 2009 permanent rule and the substantive challenge under the Organic Acts as to the 2009 temporary rule. To have Article III standing, Petitioners must demonstrate: "(i) an injury in fact that is both concrete and

19

particularized as well as actual or imminent; (ii) an injury that is traceable to the conduct complained of; and (iii) an injury that is redressable by a decision of the court." Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)). In addition to the constitutional requirements, Petitioners "must also satisfy the following set of prudential principles: (1) [Petitioners] generally must assert [their] own legal rights; (2) the court must refrain from adjudicating 'generalized grievances' most appropriately addressed by one of the other branches of government; and (3) [Petitioners' petition] must fall within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question." Mount Evans Co. v. Madigan, 14 F.3d 1444, 1450–51 (10th Cir. 1994). We analyze prudential standing only if the Article III standing requirements are met. Id. In a case such as this, where the court is presented with a factual attack on the petition, "a district court may not presume the truthfulness of the [petition's] factual allegations." Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995). Instead, "[a] court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." Id. We review "a dismissal for lack of subject-matter jurisdiction de novo, accepting the district court's findings of jurisdictional facts unless they are clearly erroneous." June v. Union Carbide Corp., 577 F.3d 1234, 1238 (10th Cir. 2009) (quoting Montoya v. Chao, 296 F.3d 952, 954–55 (10th Cir. 2002)).

Here, Petitioners agree they cannot bring an action *parens patraie* on behalf

20

of their citizens. Rather, Petitioners contend the 2009 rules resulted in economic losses and adverse displacement effects that violated their sovereign and proprietary interests in violation of the Organic Acts. Petitioners also assert harm from NPS's alleged procedural APA and NEPA violations, which, as mentioned above, are live controversies with respect to Grand Teton only. Petitioners bear the burden of proving they have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent," not "conjectural" or "hypothetical." Defenders of Wildlife, 504 U.S. at 560–61. We hold the district court correctly determined Petitioners failed to meet their burden of showing direct injury to their sovereign or proprietary interests as to both rules and from violation of the APA and NEPA's procedures as to the 2009 permanent rule.[5] We address each alleged violation in turn.

A.

Petitioners first argue Respondents harmed their sovereign and proprietary interests in violation of the Organic Acts because restrictions on snowmobile access

---

[5] Petitioners contend the district court did not address their standing to pursue their claims under the Organic Acts. We cannot agree. The court stated that Wyoming asserted "NEPA and non-NEPA claims." Bd. of Cnty. Comm'rs of Cnty. of Park, 2010 WL 6429153, *9 (D. Wyo. Sept. 17, 2010). The district court correctly recited Petitioners' contentions regarding the economic detriment from the limitations on snowmobiles, the commercial guide requirements and the continued uncertainty for future seasons. It also discussed Petitioners' argument as to displacement of snowmobiles. The court made an express finding the claimed economic injuries are speculative, at best. The court later stated "[a]s to *the other claims*, neither party's assertion regarding the NEPA claims withstand scrutiny." Id. at *17 (emphasis added). An examination of the record clearly shows the district court addressed standing under the Organic Acts in addition to NEPA.

21

to the parks correlate directly to lost revenues to the state and county. In support of this claim, Petitioners assert: (1) NPS "explicitly determined" in the EA Petitioners will suffer economic harm from the 2009 rules; (2) the parks are the centerpiece of Petitioners' tourism marketing expenditures, which generate jobs, payroll associated with those jobs, and tax revenues for local, county, and state governments; and (3) each snowmobile entry into the parks corresponds to tax revenues for Petitioners and evidence in the record shows snowmobilers will be turned away from the parks under the 2009 rules.

First, NPS made no determination in the EA that Petitioners will suffer economic harm. Rather, the EA states the economic impact of Alternative 2 is difficult to detect at the state, county, or community level. Aplt. App. vol. v, at 1187. Specifically, the EA states despite the negligible impact on the state and county level, local businesses and their employees will suffer adverse effects. Id. The EA concluded that although local businesses will experience adverse results from the adoption of Alternative 2, *the state and county will not notice harmful economic effects*. Because the EA concludes some local businesses and individuals, not the state and county, will experience some adverse effects, we conclude NPS did not admit in the EA Petitioners are suffering tax losses. The NPS admission that local businesses are adversely impacted by Alternative 2 does not provide Petitioners with standing because, as Petitioners concede, they cannot bring a suit on behalf of local business owners, i.e., their citizens, but must instead sue to protect their own sovereign interest. See Wyoming ex rel. Sullivan v. Lujan, 969 F.2d 877, 883 (10th

22

Cir. 1992) (concluding states may not sue the federal government on behalf of their citizens because "the federal government is presumed to represent the State's citizens").

Next, as to Petitioners' contention the parks are the centerpiece of tourism marketing expenditures, we find nothing in the regulations to prevent Wyoming and Park County from promoting tourism and further see no evidence in the record the regulations have impacted the promotion of tourism. To support their claim, Petitioners once again turn to the EA. In addition to the EA, Petitioners rely on affidavits of various state and county officials. Jill Shockley Siggins, Chairman of the Board of County Commissioners of Park County, attested that when NPS "reduces public use in the parks . . . Park County is harmed by the resulting reduction in sales tax and the diminished aesthetic resources Park County has to advertise." Aplt. App. vol. i, at 256. The affidavit of Bradley Hill, Director of the Wyoming Trails Program cites a 1995 study in his affidavit which found out of state snowmobilers generated $4.7 million in sales tax revenue in Wyoming. Aplt. App. vol. ii, at 299.

Siggins' affidavit is conclusory. Although she attests the county is harmed by a reduction in sales revenue, she provides no underlying evidence to support her claim that a reduction in revenue even exists. Likewise, Hill's affidavit is not helpful to establish standing. Citation to a study conducted over 15 years ago does not establish Petitioners are suffering a loss resulting from the 2009 rules. Petitioners additionally cite to yet another conclusory statement in Siggins' affidavit

23

that the general fund can be used to fund advertising for the county. Aplt. App. vol. i, at 255. This statement, however, does not demonstrate Petitioners have standing because Petitioners provide no evidence of the general fund actually decreasing, nor have they shown the general fund revenues will decrease in the future. Petitioners also suggest we look to Wyoming Travel and Tourism's comments to the 2009 rules. Specifically, comment 2 states Wyoming outfitters will lose revenues because of lost permits. The comment also states outfitters will be forced to cancel reservations already made and will be forced to lay off staff. Petitioners' asserted interest in the jobs of their citizens implicates standing pursuant to *parens patriae*, which, as the parties agree, is not available when a state sues the federal government because the federal government is presumed to represent the citizens' interests.

Importantly, Petitioners have not shown the 2009 rules have or will result in lost revenue. Petitioners do provide evidence demonstrating more than 318 snowmobilers entered Yellowstone on six so-called "peak days" during the 2008–09 winter season. Aplt. App. vol. vi, at 1313. Petitioners suggest "lopping off" these peak days will significantly reduce the number of snowmobile entries, thus reducing the amount of tax revenue collected. But Petitioners compiled data for *every* entrance into the park. The North, Northeast, and West Entrances all border Montana, and the Petitioners provide no evidence that reduced snowmobile entries from Montana impact Wyoming tax revenue collections.

NPCA provided evidence detailing the average daily entry of snowmobiles entering just Yellowstone's East Entrance. From the 2004–05 winter season through

24

the 2008–09 winter season, on average, only four snowmobiles entered the park per day—far below the 2009 temporary rule's maximum of 20 per day and Petitioners' January 2001 figure of 41 per day. Aplt. App. vol. ii, at 401. Petitioners also fail to provide evidence that the 2009 rules would reduce entries from the South Entrance.[6]

Even assuming that the rule did not reduce the entries at the South and East Entrances, Petitioners have failed to show that reductions in entries reduce tax revenue. Petitioners rely on the EA to argue that reductions in snowmobile entries from the South and East entrances reduce the amount of tax revenue collected, but, once again, their reliance is misplaced. The EA did find that each snowmobile entry into the *West Entrance* of Yellowstone corresponds to tax revenues. Aplt. App. vol. v, at 1185. But the EA made no such finding for the other entrances. NPCA's evidence actually shows the opposite result for the East Entrance. As snowmobile use decreased from the East Entrance into Yellowstone, winter tourism and lodging

---

[6] Petitioners blame the reduction between 2001 and 2004 in part on the commercial guide requirement. But Petitioners have no evidence to support their position. They present the affidavit of Bert Miller, president of the Cody County Snowmobile Association and vice president of the Wyoming State Snowmobile Association. Aplt. App. vol. i, at 260. Miller's conclusory statement that commercial guide requirements are reducing interest in snowmobiling in Yellowstone cannot explain away a decade-long trend of declining snowmobile entries from the East Entrance. As discussed above, data presented to the district court showed that in none of the five seasons prior to the adoption of the 2009 rules did the average daily number of snowmobiles entering Yellowstone's East Entrance reach the 2009 rule's 20 snowmobile limit. Petitioners fail to provide support for their conclusory proposition other than one statement in an affidavit stating "expensive" commercial guides hinder snowmobile use in the parks.

25

tax revenue *increased* in Park County. Aplt. App. vol. ii, at 404–07; vol. v, at 1115. No party has demonstrated that reduced entries at the South Entrance have corresponded to decreased tax collection. NPS states in the EA, "[o]f the five regional economic areas examined in this analysis, only for the gateway community of West Yellowstone is there a detectable impact on the relevant area's economy from winter use in Yellowstone (and that on the surrounding national forests)." Aplt. App. vol. v, at 1121.[7] The petitioners have failed to meet their burden of showing an injury in fact. Record facts consisting of conclusory statements and speculative economic data are insufficient to lead us to any other conclusion. Accordingly, we hold Petitioners lack standing to bring this civil action.

Petitioners contend our holding conflicts with our decision in Mount Evans Co. v. Madigan, 14 F.3d 1444 (10th Cir. 1994), in which we held a county had Article III standing to challenge a decision of the United States Forest Service not to rebuild a structure on Forest Service lands. The structure provided "shelter, toilets, first aid, access to medical and rescue teams, and food and souvenir sales for the accommodation of the public visiting the summit of Mount Evans." Mount Evans, 14 F.3d at 1448. The county generated revenue from the structure through

---

[7] While the EA projected some economic impacts in Jackson, Wyoming from the 2009 temporary rule's snowmobile entry limit at the South Entrance, these projections compared the 2009 temporary rule limits to historical conditions from 1997 to 1998 and 2001 to 2002. Id. at 1188. But the number of snowmobiles entering the park has fallen dramatically since the 2001 to 2002 season, and the EA does not suggest that the 2009 temporary rule will have any economic impacts in Jackson at current use levels.

26

a twenty-five percent revenue sharing program with the Forest Service. We held the county did suffer an injury in fact by "a loss of revenue sharing and sales tax monies." We further stated the record was clear, if the Forest Service rebuilt the structure, the county would again receive revenue from revenue sharing and sales taxes if the concessions were reopened in the structure. Id. at 1451.

In contrast to Mount Evans, Petitioners in this case have presented no concrete evidence revenues have decreased or will decrease with the 2009 temporary rule in place. Respondents believe a favorable decision for Petitioners would create a dangerous precedent—finding standing where a federal regulation would have solely a "generalized impact" on the economy of a state or a state's general tax revenues. We agree Petitioners have presented only a generalized grievance and holding otherwise might spark a waive of unwarranted litigation against the federal government. Indeed, "the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact to support state standing." Pennsylvania v. Kleppe, 533 F.2d 668, 672 (D.C. Cir. 1976).

We do not foreclose the argument that reduced tax revenues can provide a state with Article III standing. Id. Rather, a state must show a "fairly direct link between the state's status as a . . . recipient of revenues and the legislative or

administrative action being challenged."[8] Id. Petitioners argue a specific source of revenue, sales tax, is reduced because of the 2009 rules and rely on Wyoming v. Oklahoma, 502 U.S. 437 (1992). But unlike the present case, the Supreme Court in Wyoming v. Oklahoma found a direct injury in the form of a loss of *specific* tax revenues. In Wyoming v. Oklahoma, Wyoming brought a commerce clause challenge to an Oklahoma statute requiring "Oklahoma coal-fired electric generating plants producing power for sale in Oklahoma to burn a mixture of coal containing at least 10% Oklahoma mined coal." Id. at 440. Wyoming did not sell coal, but it did "impose a severance tax upon the privilege of severing or extracting coal from land within its boundaries." Id. at 442. Wyoming collected severance taxes on coal extracted by eight mining companies that sold coal to four Oklahoma electric utilities. Id. at 442–43. Facts showed from 1981 through 1984, four Oklahoma utilities purchased "virtually 100%" of their coal from Wyoming sources. After the effective date of the Act, unrebutted evidence showed that Wyoming lost hundreds of thousands of dollars in severance taxes. Unlike the evidence presented to the Supreme Court in Wyoming v. Oklahoma, Petitioners in this case have presented us with no evidence that specific loss of tax revenues have occurred, and their assertions of future lost tax revenues are merely speculative

For the above stated reasons, we agree with the district court Petitioners'

---

[8] We agree with Petitioners the extent of the injury is not relevant to determination of standing. We reach our holding because Petitioners have failed to show *any* concrete injury in fact.

28

evidence regarding economic loss is speculative.[9]  Accordingly, Petitioners have

failed to demonstrate a concrete injury in fact from any alleged economic loss.

B.

Petitioners additionally assert they have standing under the Organic Acts

because of adverse displacement effects from snowmobilers choosing not to

snowmobile in Yellowstone.  Petitioners state some displaced snowmobilers will

choose to snowmobile in Montana, taking their money with them, while other

snowmobilers will snowmobile in the adjacent national forests in Wyoming.  Hill,

in his affidavit, declares "The daily displacement of hundreds of snowmobiles into

the adjacent National Forests causes significant increase in the management,

grooming and trail upkeep responsibilities of the Trails Program."  Aplt. App. vol.

ii, at 298.  Petitioners assert this displacement will impose additional burdens on the

remaining trails and facilities in Wyoming and further impose environmental,

regulatory, and economic costs on Wyoming and Park County.  Petitioners state they

bear these burdens and costs because Wyoming, not the United States Forest Service,

operates the Trails Program which pays to maintain, groom, sign, and map the

snowmobile trails on the national forest lands in Wyoming.  Wyoming additionally

argues the national forests are at or near carrying capacity for snowmobile use and

that the Forest Service is likely to impose additional restrictions on the forests,

---

[9] We need not decide in this case whether a district court's conclusion that facts are speculative is a factual finding or a legal conclusion because even under the more exacting de novo standard, we agree with the district court Petitioners' evidence regarding economic loss is speculative.

which, in turn would interfere with the mission of the Trails program.[10]  Park County maintains it plows the Beartooth Highway and the parking area at Pilot Creek, which both will see increased traffic from displaced snowmobilers.  Wyoming further asserts standing exists because it offers fishing licenses, regulates fishing within Grand Teton National Park, and strives to provide anglers with opportunities to access the state's fisheries, including Jackson Lake.  Jackson Lake is jointly managed by the Bureau of Reclamation, NPS, and the Wyoming Game and Fish Department.  Petitioners offered the affidavit of Michael Stone, an employee of the Wyoming Game and Fish Department, to show the "unreasonable and unnecessary restrictions on access to Jackson Lake by snowmachine[s] negate the benefits of decades of intensive management and will require future changes in management of the fishery."  Aplt. App. vol. ii, at 304.  Respondents argue the Federal Government, not Wyoming, has ultimate responsibility for managing resources within the parks *and* the national forests.  Thus, any role Wyoming has in managing Jackson Lake or the national forests is done only with the permission of the federal agencies responsible for those federal resources.

We agree with the district court that Hill's statement that "hundreds" of snowmobilers will be displaced because of the 2009 rules is "rhetorical exaggeration."  Bd. of Cnty. Comm'rs of Cnty. of Park, 2010 WL 6429153 at *14 (D.

---

[10] According to Hill, the Wyoming Department of State Parks and Cultural Resources established the Wyoming Trails Program "in part to enhance snowmobile trails and create recreational opportunities for snowmobiling within the State of Wyoming."  Aplt. App. vol. ii, at 297.

Wyo. Sept. 17, 2010). We have no evidence in the record which demonstrates an increase in snowmobiling in national forests. As discussed above, Petitioners have failed to provide evidence showing snowmobilers are being turned away from the East Entrance or are choosing to snowmobile on state lands or in national forests instead of Yellowstone. Moreover, like the district court below, we fail to see how Petitioners are harmed by snowmobilers choosing to snowmobile on adjacent *federal* land instead of in the parks. Although the state's Trails program does perform trail upkeep in the national forests, it does not own any property or directly control any trail. Id. at *14 n.4 (citing Wyoming Trails, http://wyotrails.state.wy.us/). Additionally, the United States Forest Service has ultimate responsibility for management of public lands in national forests. Id. at *14 (citing McKeen, 615 F.3d at 1246). Petitioners further contend they have a regulatory interest in air quality within their borders. Again, Petitioners have not stated how shifting snowmobilers from national forests to the parks will better air quality, as both the forests and the parks are within Wyoming's borders. Moreover, NPS analyzed air quality, air pollution, air emission requirements and effects on wildlife and soundscapes in the EA. NPS concluded the 2009 rules will maintain "pristine" air quality in the region. Aplt. App. vol. v, at 1196–97.

Park County further claims standing based on increased maintenance of roads and parking lots. We fail to see how these interests provide Park County standing. Regardless of the number of snowmobilers displaced from the parks to the forests, Park County would still plow the snow off of the Beartooth Highway. As to the

31

additional burden of clearing a parking lot, we have no concrete evidence additional snowmobilers would even be displaced, let alone choose to snowmobile in the adjacent national forests. Once again, Park County provides us only speculative evidence consisting of conclusory statements.

As to Jackson Lake, Stone, in his affidavit, states specific fish management activities include "fish stock and spawning assessments, enforcement on an annual basis, and a creel survey about every 5 years." Aplt. App. vol. ii, at 302–03. Stone also asserts it has taken several decades to achieve the current quality and reputation of winter fishing opportunity available on Jackson Lake, which "would be almost completely lost without adequate snowmobile access to the surface of the lake." Id. at 303–04. Petitioners have failed to submit evidence that, as a result of the 2009 rules, snowmobilers are being turned away from Grand Teton. And even if snowmobilers were turned away from entering Grand Teton to travel to Jackson Lake, nothing in the 2009 rules precludes Wyoming Game and Fish Department from continuing to manage the fishery in the manner described in Stone's affidavit. Accordingly, we conclude Petitioners have failed to allege facts sufficient to show an injury in fact from displacement of snowmobiles from the parks to other land within the state. Having determined Petitioners lack standing to bring their substantive challenge to both the temporary rule and the permanent rule under the Organic Acts, we turn to Petitioners' standing to bring the alleged procedural violations as to Grand Teton.

C.

32

Even though we determined Petitioners' procedural challenge to the 2009 temporary rule for Yellowstone is moot, we still must address Petitioners' procedural challenge to the 2009 permanent rule for Grand Teton. NEPA's purpose is to protect and promote environmental quality. 42 U.S.C. § 4331(a-c). "To ensure this protection, [NEPA] establishes 'action forcing' procedures the agencies must follow." Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 448 (10th Cir. 1996). Thus, "the agency will take a 'hard look' at the environmental consequences of its actions." Id. (citing Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976)). Importantly, NEPA "does not mandate the particular decisions an agency must reach." Id. Instead, it mandates "the necessary process the agency must follow while reaching its decisions." Id. Failure to follow NEPA's procedures "creates a risk that serious environmental consequences of the agency action will not be brought to the agency decisionmaker's attention." Id. Accordingly, "an injury of alleged increased environmental risks due to an agency's uninformed decisionmaking may be the foundation for injury in fact under Article III." Id. at 449. A party properly alleges an injury in fact from failure to perform a NEPA analysis where it shows: "(1) that in making its decision without following the NEPA's procedures, the agency created an increased risk of actual, threatened or imminent environmental harm; and (2) that this increased risk of environmental harm injures its concrete interest." Sierra Club v. U.S. Dep't of Energy, 287 F.3d 1256, 1265 (10th Cir. 2002).

In their petitions, Petitioners allege Respondents violated NEPA in a myriad

33

of ways. They first maintain NPS failed to consider a reasonable range of alternatives, including alternatives that would have authorized more snowmobile entries per day into Grand Teton, and alternatives that would have allocated entries on other bases besides a strict per day limit. Next, Petitioners contend NPS failed to analyze the correct "no action" alternative and purposefully constructed a fictitious "no action" alternative which preordained the outcome of the NEPA process. Additionally, Petitioners believe NPS did not provide a reasoned explanation for their determination to restrict snowmobile access in spite of the scientific evidence which demonstrates that more snowmobiles could be permitted without causing unacceptable impacts or impairment to Grand Teton's resources. Finally, Petitioners assert NPS neglected to take a "hard look" at the environmental consequences of the following actions: (1) allowing snowmobiles on the Continental Divide Snowmobile Trail; and (2) allowing more than 25 snowmobiles per day at Jackson Lake.

As mentioned above, in order to show an injury in fact for a procedural violation of NEPA, Petitioners must show the agency's violation "created an increased risk of actual, threatened, or imminent *environmental harm*." Id. (emphasis added). In this case, Petitioners have not shown NPS created an increased risk of actual, threatened, or imminent environmental harm by allegedly failing to follow NEPA procedures. Instead, Petitioners allege they are harmed because NPS could have promulgated a rule allowing more snowmobiles into Grand Teton without adverse environmental effects. NEPA does not protect against such an injury.

34

Comm. to Save the Rio Hondo, 102 F.3d at 448.

Petitioners further alleged Respondents did not critically review and give meaningful consideration to all of the comments submitted by Petitioners and ignored evidence, resulting in a rule that arbitrarily and capriciously excluded snowmobilers from Grand Teton in violation of the APA. We disagree. In this case, NPS followed procedures. It issued an EA and a FONSI. The record shows NPS considered the quality of the air and the effects on wildlife. See Aplt. App. vol. v, at 1196–97 ("With the conservative use limits and Best Available Technology restrictions for snowmobiles . . . the NPS expects implementation of either alterative to preserve excellent air quality in the parks."); see also id. at 1176 ("Effects on wildlife in all three parks under Alternative 2 are expected to be similar to those seen in the last five years: primarily negligible to minor (with possible moderate effects on swans and eagles)."). Petitioners have presented no evidence to show NPS did not critically review and give meaningful consideration to the comments submitted in relation to Grand Teton, nor have they presented evidence to show they have suffered an *environmental harm* from an alleged NEPA violation by NPS.

D.

Finally, Petitioners contend the district court erred by not providing Wyoming "special solicitude" in its standing analysis. In Massachusetts v. E.P.A., 549 U.S. 497, 520 (2007), the Supreme Court said states deserve "special solicitude" in standing analysis. In that case, Massachusetts proved that it had an "actual" and "imminent" injury. Wyoming has failed to prove that basic requirement here.

35

Importantly, we note the lack of guidance on how lower courts are to apply the special solicitude doctrine to standing questions. This much, however, is clear: "[t]his special solicitude does *not* eliminate the state petitioner's obligation to establish a concrete injury, as Justice Stevens' opinion amply indicates." Del. Dep't of Natural Res. & Envt'l Control v. F.E.R.C., 558 F.3d 575, 579 n.6 (D.C. Cir. 2009). Because Petitioners have failed to establish a concrete injury, we need not determine the parameters of "special solicitude" in this case.

VI.

Because we hold Petitioners' procedural challenge to the 2009 temporary rule as to Yellowstone is moot, that portion of the district court's order must be vacated and remanded to the district court to dismiss that portion of the case for lack of jurisdiction. Wyoming, 587 F.3d at 1254. As to Petitioners' remaining claims, we conclude that Petitioners lack Article III standing to bring their substantive challenge to the 2009 temporary rule as to Yellowstone and their entire challenge as to the 2009 permanent rule as to Grand Teton because Petitioners' alleged injuries are merely speculative. Accordingly, we need not address prudential standing.

AFFIRMED IN PART, VACATED IN PART AND REMANDED.

THE MANDATE SHALL ISSUE FORTHWITH.

36